Brennan Moss (10267)
PARKINSON BENSON POTTER
2750 Rasmussen Rd., Suite H-107
Park City, Utah 84098
Telephone: (415) 534-7970
Email: brennan@pbp.law

Julie Erickson (*Pro Hac Vice* forthcoming)
Elizabeth Kramer (*Pro Hac Vice* forthcoming)
Kevin Osborne (*Pro Hac Vice* forthcoming)
ERICKSON KRAMER OSBORNE LLP
959 Natoma Street
San Francisco, CA 94103
Telephone: 415-635-0631
Email: julie@eko.law
Email: elizabeth@eko.law
Email: kevin@eko.law

*Counsel for Plaintiffs*

---

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| E.P. and S.A., on behalf of themselves and others similarly situated, | **PROPOSED CLASS ACTION COMPLAINT** |
| *Plaintiffs*, | Case No. 2:25-cv-1141 |
| vs. | Judge: |
| AYLO GLOBAL ENTERTAINMENT, INC.; AYLO USA INCORPORATED; AYLO HOLDINGS CORP.; AYLO HOLDINGS S.A.R.L.; AYLO FREESITES LTD.; 9219-1568 QUEBEC, INC., and DOES 1-100 | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

The Plaintiffs allege for their complaint as follows:

## I.    INTRODUCTION

1.      Showing an eleven-year-old a video depicting a masked man raping a screaming woman is child abuse. Showing a thirteen-year-old a video depicting a male teacher sexually assaulting his female student is child abuse. Showing pornography of any kind to a child is sexual abuse. This is commonly understood, and also the law. It is a federal crime to abuse a child by showing them pornography, and perpetrators are subject to ten years in prison. 18 U.S.C. § 1470. And yet, for over a decade, Defendants have committed this crime—not just against one child, but against nearly all American children—with absolute impunity. They have harmed generations of children in the United States, exposing them to graphic and violent sexual material, and they have done so for one purpose: to make a profit.

2.      It has long been common sense that showing a child such graphic material will inflict long-lasting harm. It is now also a matter of medical science. Studies now show that early exposure to pornography can lead to a distorted view of sexuality, increased risk of sexual addiction, and difficulty forming healthy relationships later in life. Health care providers have seen alarming rates in asphyxiation of young women arising from the act of choking during physical intimacy with their sexual partners, conduct that was normalized by what Defendants produced and disseminated. The long-term psychological and emotional damage inflicted on these young victims is immeasurable.

3.      The harm caused by Defendants is demonstrated not just by such studies but also by the stories of Plaintiffs. Defendants' products stole their childhoods, leaving them addicted to material that warped their understanding of romantic love and isolating them in a world of shame and secrets for years. From using Defendants' products, E.P. and S.A. learned to believe a dangerous lie: that women should be submissive and passive during sex and that men's sexuality

was expressed in intimidation and violence. Aggressive and forceful sexual behavior was normalized, and a woman's lack of consent was portrayed as a man's sexual fantasy. Plaintiffs' notions of healthy sexuality were shattered before turning thirteen. Sadly, their story is the story of a generation of adolescents who enter adulthood with a broken understanding of sexual relationships because companies like Defendants refuse to design their products with simple and effective tools that would shield children from exposure to pornography.

4.     Defendants' platforms are designed to attract and retain as much attention as possible, including the attention of minors. Studies reveal their design works only too well. Despite the fact it is illegal to provide pornography to children in every state in the U.S., most American children have seen online pornography by the time they are eleven years old. Ninety percent have seen it by the time they turn sixteen, and ten percent have seen it by age nine. Sixty four percent of teenagers reported accidentally encountering pornography on social media, online games, or while browsing the internet.  These statistics highlight the pervasive nature of online pornography and its widespread impact on children and adolescents.

5.     Defendants know their platforms are being accessed by children. They capture detailed demographic data about their viewers, have confessed in undercover videos that they know and approve of underage users accessing their platforms, sell tools to circumvent laws requiring age verification, and are routinely confronted with the above-referenced studies on children's access to pornography.

6.     Nevertheless, Defendants take no meaningful steps to stop the harm their products cause, even though age verification tools have existed for decades and are used by other adult content websites. Online age verification tools are now commonplace for websites that sell alcohol, offer gambling platforms, and rent cars. Netflix does more to prevent children from

watching R-rated movies than Defendants do to keep children from watching hard core pornography. Even online pornography companies that compete with Defendants use these simple tools. But Defendants intentionally design their platforms to avoid age verification because such measures might reduce user engagement and, in turn, advertising revenue. Children offer Defendants a rich demographic—advertising targets whose brains are incapable of resisting addiction—that Defendants are unwilling to turn away.

7.      State legislatures across the country have taken action. At present, twenty five states, including Utha, the home state of Plaintiff E.P., have passed legislation requiring pornography websites to incorporate effect age verification tools into the design of their sites. The Supreme Court has concluded they have a compelling interest in protecting children through legislation, noting, "[m]inors […] have long been thought to be more susceptible to the harmful effects of sexually explicit content, and less able to appreciate the role it might play within a larger expressive work. They therefore possess a more restricted right to judge and determine for themselves what sex material they may read or see." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2304 (2025) (citations omitted).

8.      Defendants claim that they have disabled their platforms entirely in states, such as E.P.'s home state of Utah, where laws require them to verify a user's age. This is false. Defendants' platforms continue to be readily accessible to minors even in states with age verification statutes, through simple, universally available location-masking tools. While Defendants may claim they are ignorant of the ways minors might access their platforms in these places, this too is false. Defendants sell their own version of these tools to keep the back door to their platforms open and ensure ongoing engagement. In states without specific online age verification laws, such as S.A.'s home state of Michigan, it is still illegal to allow minors to view

pornography. Defendants flout these laws too, using only the least effective age gates imaginable to keep access easy and engagement rates as high as possible.

9.      Not only did Defendants know that they were facilitating children's access to pornography, but evidence shows they also actively targeted children. Defendants posted material on social media platforms that were designed to attract children to their platforms and applied tags like "Pokémon," "Minecraft," and "Harry Potter" to material, making it easy for children to find pornography that overlapped with their interests. Using category titles like "Cartoons," Defendants' platforms were either designed to, or obviously would, appeal to children.

10.     Defendants also designed their products to engage young people. Just as a predator will "groom" a child to engage in sexual conduct by normalizing sexually explicit material over time, so too did Defendants normalize explicit and violent sexual content with the aim of greater engagement, regardless of the negative consequences. Plaintiffs, who first encountered Defendants' platforms as minors, will be battling the long-term harm the platforms caused for the remainder of their adult lives.

11.     By designing platforms that make pornography attractive to minors and designing age verification gates that make that pornography easily accessible to minors, Defendants systematically and deliberately exploited children's vulnerability and innocence. They have not only violated numerous state and federal laws but also breached the fundamental trust that society places in an open and free internet.

12.     Plaintiffs seek to hold Defendants accountable for the health crisis they have caused by designing products that draw children in and expose them to irreparably harmful material without the appropriate, necessary, and legally required safeguards used elsewhere in

the industry. Plaintiffs seek an order requiring these companies to fix defective designs and operate their platforms so that children cannot access pornography online. Surfing the internet should not expose a child to rape videos—or any other kind of graphic sexual content.

13.     Plaintiffs E.P. and S.A. (collectively, "Plaintiffs"), on behalf of themselves and others similarly situated ("the Class"), bring this action against Defendants AYLO GLOBAL ENTERTAINMENT, INC.; AYLO USA INCORPORATED; AYLO HOLDINGS CORP.; AYLO HOLDINGS S.A.R.L.; AYLO FREESITES LTD.; and 9219-1568 QUEBEC, INC. (collectively, "Defendants") for actual damages suffered by Plaintiffs and the Class, for statutory damages and penalties, for equitable relief, and for other recovery specified herein, and allege upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record, as follows:

## II.    <u>PARTIES</u>

### A.    **Plaintiffs**

14.     Plaintiff E.P. is, and at all relevant times was, a resident of Utah. E.P. was first exposed to and viewed pornography produced or published by Defendants when he was 11 years old. He is now 23. His exposure as a child caused serious and lasting harm to his mental and sexual health. He recalls seeing images where women were gagged and restrained and appeared to be raped. The exposure to these images deeply disturbed him. E.P. developed compulsive use of pornography, which aggravated symptoms of depression and led him to consider suicide. E.P. ultimately sought treatment. He has attended regular individual and group counseling sessions at his own expense. He currently attends a church-sponsored 12-step program. He takes prescription medication for depression and anxiety but continues to struggle with sexual health and compulsive behavior. E.P. first understood that his early exposure and addiction were the root cause of these harms in January 2024, when he resumed treatment to address them directly.

15.    Plaintiff S.A. is, and at all relevant times was, a resident of Michigan. S.A. first viewed pornography produced or published by Defendants around age 13. He is now 25. S.A. experienced significant mental and sexual health harms, including symptoms of depression and compulsive consumption of pornography, that stemmed from that early exposure. S.A. has required treatment for trauma related to his exposure to pornography, including weekly group therapy sessions, which he pays for out-of-pocket and has attended for years. He lives with a sense of being trapped in an addiction with no way out, despite repeated participation in therapy programs. In January 2024, S.A. first recognized and understood that his ongoing mental health and sexual behavior struggles were caused by his early exposure and pornography use.

### B.    Defendants

16.    Defendant AYLO GLOBAL ENTERTAINMENT, INC. is a corporation incorporated in the State of Delaware, conducting business throughout the United States, including within the State of Utah. Defendant AYLO GLOBAL ENTERTAINMENT, INC. has systematically targeted internet users in Utah to capture engagement for its platforms, sold products to consumers in Utah, engaged Utah-based companies as advertisers on its platforms, and as customers for Its principal address is located at 610 Brazos Street Suite 500 in Austin, Texas, which it has occupied since 2023. AYLO GLOBAL ENTERTAINMENT, INC. is a corporate affiliate of the multinational pornographic conglomerate owned by the Canadian private equity firm Ethical Capital Partners. The company has used several names since its 2010 inception, including Playboy Plus Entertainment, Inc. (2011-2016) and MG Global Entertainment, Inc. (2016-2023), both of which were headquartered in Los Angeles, California. AYLO GLOBAL ENTERTAINMENT, INC. is a studio arm of the multinational pornographic conglomerate owned by Ethical Capital Partners that facilitates pornographic content production

for the benefit of the conglomerate. Upon information and belief, AYLO GLOBAL ENTERTAINMENT, INC., is a parent company of Defendant AYLO USA INCORPORATED.

17.    Defendant AYLO USA INCORPORATED is a corporation incorporated in the State of Delaware conducting business throughout the United States, including within the State of Utah. Its principal address is located at 610 Brazos Street Suite 500 in Austin, Texas, which it has occupied since 2023. AYLO USA INCORPORATED is a corporate affiliate of the multinational pornographic conglomerate owned by the Canadian private equity firm Ethical Capital Partners. The company has used several names since its 2010 inception, including Manwin USA, Inc. (2011-2014) and MindGeek USA Incorporated (2014-2023), both of which were headquartered in Los Angeles, California. Upon information and belief, AYLO USA INCORPORATED is a wholly owned subsidiary of AYLO GLOBAL ENTERTAINMENT, INC. and is responsible for managing AYLO GLOBAL ENTERTAINMENT, INC.'s operations in the United States, including, but not limited to, pay-per view and cable viewing of premium pornographic content.

18.    Defendant AYLO HOLDINGS CORP. is a corporation incorporated in the State of Delaware conducting business throughout the United States, including within the State of Utah. Its principal address is located at 610 Brazos Street Suite 500 in Austin, Texas, which it has occupied since 2023. Prior to 2023, AYLO HOLDINGS CORP. was based in Woodland Hills, California. AYLO HOLDINGS CORP. owns controlling shares or interests in the other Aylo subsidiary companies, including, based on information and belief, AYLO GLOBAL ENTERTAINMENT, INC., and has control over their policies and management. AYLO HOLDINGS CORP. manages the portfolio of the Aylo subsidiary businesses, operates those companies, and owns and controls certain Aylo intellectual properties, including but not limited

to, Pornhub, RedTube, YouPorn, Tube8, Brazzers, Reality Kings, and Digital Playground, among others.

19.    AYLO HOLDINGS S.A.R.L. (formerly "MindGeek S.à.r.l." and "Manwin") produces, owns, or controls the majority of pornography on the internet. It directly and, through subsidiary relationships, indirectly owns the platforms that are the subject of this litigation. It is a foreign entity (a Société à responsabilité limitée) organized and existing under the laws of Luxembourg. It conducts the majority of its business in the United States, deriving the majority of its worldwide traffic from U.S.-based users and selling to ad space to U.S.-based advertisers, including users and advertisers in Utah. Prior to 2023, AYLO HOLDINGS S.A.R.L. used the name MindGeek S.à.r.l., or simply "MindGeek." Defendants AYLO GLOBAL ENTERTAINMENT, INC.; AYLO HOLDINGS CORP., and OTHERS were, prior to 2023, subsidiaries of AYLO HOLDINGS S.A.R.L. (then, MindGeek S.à.r.l.). Although its corporate headquarters was in Luxembourg, MindGeek also had offices with employees in Montreal, Canada, and various cities in the U.S. From on or about January 2009 to December 2020, MindGeek was a global, privately held group of entities, which included Defendants AYLO USA INCORPORATED (then, MindGeek USA Incorporated), and AYLO FREESITES LTD. (then MG Freesites Ltd.), the business of which included the maintenance and operation of websites that enabled third parties to post and distribute pornographic videos. MindGeek owned and operated numerous pornographic websites and brands including Pornhub.com ("Pornhub"). MindGeek's websites were accessible throughout the United States through an internet connection, including in Utah. AYLO HOLDINGS S.A.R.L. remains the ultimate parent company of numerous Aylo (previously MindGeek) entities, including Defendants AYLO USA INCORPORATED and AYLO FREESITES LTD., as well as AYLO BILLING LTD., AYLO

BILLING US CORP (d/b/a "ProBiller"), AYLO PREMIUM, LTD., and TRAFFIC JUNKY

INC. (d/b/a "TOQON LLC"). Upon information and belief, AYLO HOLDINGS S.A.R.L. exerts

considerable influence and control over each subsidiary in the single endeavor of designing,

manufacturing, marketing, and distributing pornographic content to a global market that includes

the United States and the State of Utah. AYLO HOLDINGS S.A.R.L. directs its complex

network of subsidiaries so that Aylo subsidiaries are interdependent. AYLO HOLDINGS

S.A.R.L. controls the Aylo multinational pornographic conglomerate at large and directs the flow

of money between subsidiaries. AYLO HOLDINGS S.A.R.L. is the ultimate parent company of

AYLO FREESITES LTD., the operator of websites that are relevant to Plaintiffs' injuries.

20.     AYLO FREESITES LTD. (formerly MG Freesites Ltd.) (d/b/a "Pornhub") is the

operator of numerous "tube" sites (video-sharing websites) owned by AYLO HOLDINGS

S.A.R.L. that are relevant to Plaintiffs' injuries, such as Pornhub, RedTube, YouPorn, and

Tube8. It is a company incorporated in the Republic of Cyprus and conducting business in the

United States, including in this District. AYLO FREESITES LTD. is a wholly owned subsidiary

of AYLO HOLDINGS S.A.R.L., either directly or through intermediary companies that are also

under the control of AYLO HOLDINGS S.A.R.L. Upon information and belief, AYLO

FREESITES LTD. is predominantly under the control of and operated by directors, officers, and

employees working in Aylo's offices in the United States and Canada, with little to no business

operations being conducted within the Republic of Cyprus.

21.     9219-1568 QUEBEC, INC. (d/b/a MindGeek) provides services and operational

functions to AYLO FREESITES LTD. and, based on information and belief, provides content

moderation services to the "tube" platforms operated by AYLO FREESITES LTD. It is a

company organized and existing under the laws of Canada with a principal place of business located in Montreal.

22.     Herein, "Defendants" or "Aylo" refers to AYLO GLOBAL ENTERTAINMENT, INC.; AYLO USA INCORPORATED; AYLO HOLDINGS CORP.; AYLO HOLDINGS S.A.R.L.; AYLO FREESITES LTD.; 9219-1568 QUEBEC INC; and OTHERS, and all of their parents, subsidiaries and affiliates.

23.     Defendants have incorporated hundreds of subsidiaries and related companies around the world, the details of which are unknown to Plaintiffs at this time. Defendants occupy the same offices, share a significant overlap in senior management including board members, executives, directors, and managers, and utilize common data and analytics towards the single goal of promoting Aylo products.

24.     Defendants have changed their names several times to avoid public scrutiny, hinder litigation against its various subsidiaries, and to appear as entities that are independent from one another. However, all the Aylo entities operate as a single business enterprise, commingling their funds and other assets to shelter and avoid liabilities and to hide the identity of their owners, and are jointly and severally liable in this action as alter egos of one another.

25.     The Aylo entities cooperate with each other closely to execute the goals of and generate profit for the Aylo conglomerate. For example, websites operated by AYLO FREESITES LTD. collect data that is used to bolster the objectives of advertising and revenue arms such as Defendant AYLO USA INCORPORATED as well as AYLO BILLING US CORP, AYLO BILLING LTD. and TRAFFIC JUNKY INC. The Aylo entities have never been at an arms-length distance from one another and are suspected to be undercapitalized and out of

compliance with corporate formalities. Plaintiffs are unaware of any Aylo-related entity that does not act at the direction of the Aylo enterprise operated by Defendants.

26.    The Aylo entities were, at all relevant times, separate companies in name only. The true organizational structure of the Aylo entities is that of a single company that exerts control over the entire organization. This corporate structure was not created and is not maintained for any legitimate business purpose or need of the organizations and has no economic substance. It is designed to avoid the laws of the United States and other countries with respect to taxes and pornography. The nominal corporate structure allows Aylo to hide its ownership, obscure its business practices, and shelter its assets from regulatory scrutiny and enforcement. All Defendants are, in fact, a single business entity run by the three individuals at the top of Aylo's corporate structure. These individuals, Bernd Bergmair, Feras Antoon, and David Tassillo, commingle the funds and assets of the various Aylo entities among themselves and among the other Aylo entities, deploy the corporate resources and employees of the various Aylo entities to efforts of the others, direct the various Aylo entities to assume the debt of the others, use the same office locations and employees for various Aylo entities, undercapitalize the various Aylo entities, and scheme to maintain a sham corporate structure that exists for illegal purposes. Accordingly, any separateness between the Aylo entities should be disregarded and each should be held jointly and severally liable as alter ego of the others.

27.    The true names and capacities of DOES 1 through 100, inclusive, are unknown to Plaintiffs who sue such Defendants by use of such fictitious names. Plaintiffs will amend this complaint to add the true names when they are ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is legally responsible for the

occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

28.    At all relevant times, all Defendants were and are legally responsible for all the unlawful conduct, policies, practices, acts, and omissions as described in each and all of the foregoing paragraphs, unless otherwise indicated.

29.    At all relevant times, the unlawful conduct against Plaintiffs and Class members as described in each and all of the paragraphs herein was actuated, in whole or in part, by a purpose to serve Defendants. At all relevant times, upon information and belief, the unlawful conduct described in each and all of the foregoing paragraphs was reasonably foreseeable by Defendants and committed under actual or apparent authority granted by Defendants such that all the aforementioned unlawful conduct is legally attributable to all Defendants.

## III.    <u>JURISDICTION AND VENUE</u>

30.    This action is brought under the tort of product liability, under the tort of negligence, under the tort of fraud, for violation of unfair competition and consumer protection statutes, for the sexual exploitation of children in violation of 18 U.S.C § 2255, for distribution of material harmful to minors without age verification in violation of Utah Code §§ 78B-3-1001, *et seq*.,[1] and under for monetary and equitable non-monetary relief, statutory penalties, and other relief owed due to Defendants' conduct.

31.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, the Class Action Fairness Act of 2005 because: (i) there are 100 or more proposed Class Members,

---

[1] Plaintiffs will, at the appropriate time, amend this complaint to add a claim under Utah's cause of action for Minors Injured by Pornographic Material, Utah Code §§ 78B-6-2100, *et seq*.

(ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and

(iii) there is minimal diversity because a substantial number of proposed Class Members are

citizens of states different from Defendants. This Court has supplemental jurisdiction over

Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

32.     This Court has personal jurisdiction over Defendants because Defendants and

their affiliates do business in the State of Utah and the claims asserted herein arise from conduct

occurring in Utah. The Court may properly exercise personal jurisdiction over all Defendants

because each of the Defendants maintains minimum contacts with this District such that

maintenance of this lawsuit does not offend traditional notions of fair play and substantial

justice. Defendants have, during the relevant period, extensively engaged with a significant

number of Utah residents through subscription services, provision of content, recommendations

for consumption, collection of personal data, provision of products and services, and have

generally conducted regular business activities in Utah and derived substantial revenue from

their presence within this State. Defendants have offices throughout the U.S. and conduct

business directly related to the platforms at issue in this litigation both in Utah and throughout

the U.S.

33.     This Court also has personal jurisdiction over Defendants pursuant to 18 U.S.C. §

2255 because each Defendant transacts business on a systematic and continuous basis in the

United States and this District and has engaged in tortious misconduct here in violation of U.S.

law, Rule 4(k)(2) of the Federal Rules of Civil Procedure which provides a federal forum for

claims over the foreign defendants, and under the Utah long-arm statute, Utah Code Ann. § 78-

27-22, *et seq*., because each defendant, directly and through agents, transacts business within the

state; committed tortious acts and omissions within the state; committed tortious injury in the

state caused by an act or omission outside the state; regularly conducted business within the state during the relevant period, engages in persistent course of conduct, and derives substantial revenue from services rendered in Utah. Among other things, Defendants (i) directed their activities at residents in the U.S. and in Utah; (ii) derived benefit from the activities of residents in the U.S. and in Utah; (iii) created a substantial connection with individuals and corporations in the U.S. and in Utah; (iv) engaged in significant activities in the U.S. and in Utah; (v) created continuing contractual obligations between advertisers and other corporations in the U.S. and in Utah; and (vi) caused foreseeable harm to persons in the U.S. and in Utah. This conduct has resulted in harms that occurred within this State and to people who are residents of this State.

34.     Venue is proper in this Court because, *inter alia*, Defendants do engage and perform or have, during the applicable time period, engaged and performed business activities in the State of Utah. Many of the acts committed by Defendants complained of herein occurred in this judicial district. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendants conduct or have, during the relevant time period, conducted substantial business in this District, established sufficient minimum contacts with this District, and otherwise purposely availed themselves of the markets in this District, through the promotion, sale, and marketing of digital material in this District.

35.     Utah's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV § 1, of the U.S. Constitution. Utah has significant contact, or a significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of Utah state law is not arbitrary or unfair.

IV.    **FACTUAL BACKGROUND**

A.    **The Genesis and Current State of the Online Pornography Industry in America**

36.    The beginning of the online pornography industry is closely intertwined with the development of the internet itself.

37.    In 1987, Bulletin Board Systems (BBSs) first allowed users to connect directly via dial-up connections to access and share adult content. Around the same time, "USENET" newsgroups, which originated as a service of telecom company AT&T, emerged as another precursor to modern online pornography. While these early systems were not technically a part of the internet, they were among the first digital platforms to host adult content and allow users to post and access encoded images.

38.    The invention of the World Wide Web in the mid-1990s marked a turning point for the pornography industry. In 1995, the earliest websites dedicated entirely to pornographic material were hosted and accessible to all with internet access. The Web provided a platform that was perfectly suited for distributing adult content, offering greater accessibility and anonymity than anything previously offered by BBSs, print, or video.

39.    The mid-1990s also saw a surge in public awareness and concern about online pornography. In 1995, Time magazine published a cover story titled "Cyberporn," highlighting the growing prevalence of adult content on the internet. This period marked the beginning of widespread discussions about the social implications of easily accessible online pornography.

40.    As internet speeds increased and digital cameras became more accessible, the production and distribution of pornographic content accelerated. The "amateur revolution" took hold, with individuals creating and sharing their own content independently and without the need

for mainstream networks. This "democratization" of pornography production significantly expanded the volume and variety of content available online.

41.     These tools also opened new avenues for profit. By 2000, pornography websites like Danni's Hard Drive were reporting multi-million dollar revenues, revealing the lucrative potential of the industry. In 2006, worldwide pornography revenues reached $97 billion, with the United States alone generating $13.33 billion. The industry quickly capitalized on the internet's potential, with 4.2 million pornographic websites accounting for 12 percent of all websites by the mid-2000s. Daily pornographic search engine requests totaled 68 million, representing 25 percent of all search engine queries. By 2007, the adult entertainment industry in the U.S. was estimated to be worth $10-13 billion annually, with $4-6 billion considered legal revenue.

42.     Greater access to pornography led to more alarming and harmful content becoming commonplace on many pornography websites. And this extreme content was available to anyone with internet access, including children. According to an L.A. Times article from 2013, "[f]or the first time in the history of humanity, children can easily be exposed to the most extreme, misogynistic sex acts imaginable, thanks to the phenomenon of Internet porn." David Horsey, "Our Social Experiment: Kids with Access to Hard-Core Porn," L.A. TIMES (Sept. 3, 2013). And this trend began before the proliferation of smartphone use among children.

43.     The advent of streaming technology in the mid-2000s further revolutionized the consumption of online pornography. Websites like those launched under the "Interhub" umbrella of companies in 2007 became immensely popular, offering vast libraries of free content to users. This shift disrupted traditional business models and further increased the accessibility of pornographic material.

44.    The rise of smartphones and tablets in the 2010s made accessing online pornography even easier and more private. In 2012, the total number of pornographic websites was estimated to be around 25 million, comprising approximately 12 percent of all websites on the internet. Concurrently, social media platforms and messaging apps created new channels for privately sharing and distributing adult content. Today, using smartphones to access free pornography online is the most common means of viewing pornographic material.

45.    Presently, the amount of pornographic content accessible online is estimated at over 10,000 terabytes and major platforms like those under Defendants' umbrella remain among the most accessed websites on the internet. In the United States, 68 million daily search queries—25 percent of all internet searches—are related to pornography. Approximately 69 percent of American men acknowledged viewing online pornography in 2024. Researchers estimate the number of adult men who will watch online pornography in 2025 is approximately 150 million, up from just 5 million in 1990.



**Estimated online pornography viewers**
(in millions)

46.    The pornography industry is aggressively expanding. The market size for adult and pornographic websites in the U.S. grew at a rate of 8.1 percent between 2020 and 2025,

reaching $1.3 billion. The adult content market is projected to grow at rate of 6.5 percent annually from 2025 to 2033.

47.    The pornography industry continues to maneuver for new markets. Online tools currently offer AI-generated content, where user prompts direct software to create realistic and personalized scenes with fully animated characters. Deepfakes portray celebrities, models, or even ordinary people superimposed on existing pornographic content. And pornography companies are developing technology for virtual and augmented reality pornographic experiences. This is all designed to open additional revenue streams and further saturate the internet with pornographic content.

**B.    Defendants' Products Are Causing a Public Health Crisis Among American Children**

48.    As technology has advanced, so has the accessibility of online pornography to children. Researchers estimate that children are first exposed to pornography, on average, at just 11 years old. Even more alarmingly, 70 percent of children aged 7 to 18 have accidentally encountered online pornography, often while doing homework.

49.    A 2006 study reported that over 70 percent of children have seen pornography before turning 18, and some are first exposed at just 8 years old. That study also found that more than 30 percent of male participants had viewed sexual bondage, more than 30 percent had seen sexual contact between humans and animals, and more than 20 percent had seen pornography involving urine or feces. Appallingly, more than 20 percent reported viewing sexual violence or rape online.

50.    The impact of this exposure on children is calamitous. Research indicates that early exposure to pornography can lead to distorted views of sexuality, increased risk of sexual addiction, and difficulties in forming healthy relationships later in life. Clinicians chronicle

disassociation, adolescent depression, and symptoms such as headache, irritability, trouble sleeping, poor social functioning, impulsiveness, anxiety, and dysfunctional stress responses. Children exposed to pornography may suffer impairments to judgment, memory, and emotional regulation. Other studies have suggested that pornography exposure leads to greater use of tobacco, alcohol, and illegal drugs.

51.    Research shows that the level of toxic behavior demonstrated in online pornography has increased to a point where it is potentially extremely harmful to healthy sexual development.

> "Most of today's pornography does not reflect consensual, loving, healthy relationships. Instead, pornography teaches dominance, aggression, disrespect, and objectification."

Byrin Romney, "Screens, Teens, and Porn Scenes: Legislative Approaches to Protecting Youth from Exposure to Pornography" 45 VT. L. REV. 43, 43 (2020). Nevertheless, children exposed to pornography believe it accurately portrays adult sexuality. A British study found that over 40 percent of children from 15 to 16 expressed the desire to mirror pornography, with half of all boys included in the study reporting that they believe that online porn depicts realistic sexual activity.

52.    Perhaps most concerning, clinicians have reported children exposed to pornography at a young age emulate sexual strangulation, sexual violence, and sexual coercion. Adult content featuring what is referred to as "choking," or nonfatal strangulation, is a "staple" of online pornography. Peggy Orenstein, "The Troubling Trend in Teenage Sex" N.Y. TIMES (Apr. 12, 2024).

> "[Defendants' site Pornhub] is infested with rape videos. It monetizes child rapes, revenge pornography, spy cam videos of women showering, racist and misogynist content, and footage of women being asphyxiated in plastic bags."

Nicholas Kristof, "The Children of Pornhub" N.Y. TIMES (Dec. 6, 2020). Such conduct poses obvious neurological harm, including brain injury, seizure, motor and speech disorders, and memory loss. Unsurprisingly, children exposed to pornography mirror such conduct. *Id*. (showing an increase in the incidence of sexual strangulation of girls between the ages of 12 and 17 who were exposed to online pornography). A recent study in Australia found that sex offenses by school-aged children quadrupled over a four-year period, with authorities attributing this rise to increased exposure to online pornography. A 2019 study revealed that tenth grade boys in the United States who had been exposed to violent pornography were 2 to 3 times more likely to commit sexual violence against a dating partner than unexposed classmates.

53. The problem is not limited to passive consumption. A troubling trend of "self-generated" content has emerged, where children are groomed or coerced into producing explicit material themselves. In 2022, 78 percent of web pages containing child sexual abuse imagery featured self-generated content, often involving girls aged 11-13.

54. Research showing the alarming number of children who are exposed to pornography is not new. Academic journals such as those reporting the statistics referenced above have been documenting studies on the age of exposure to online pornography for more than a decade. More recent studies have reported the devastating psychological and physical toll this exposure has taken.

### C. Aylo's Origins and Its Fully Integrated Collection of Online Products

55. Defendants are technology and media enterprises within a conglomerate of companies collectively known as Aylo. The company was started by Fabian Thylmann, a German entrepreneur. It owns many websites, production companies and brands. Its digital properties include Pornhub, RedTube, YouPorn, Tube8, Playboy Digital, Men.com, My Dirty

Hobby, Thumbzilla, PornMD, Brazzers, Reality Kings, Digital Playground, Twistys, and Mofos, among others. As the *New York Times* put it, "[Aylo] is a porn titan. If it operated in any other industry the Justice Department could be discussing an antitrust case against it." Nicholas Kristof, "The Children of Pornhub" N.Y. TIMES (Dec. 6, 2020).

56.    In the late 1990s, Thylmann developed NATS (Next-Generation Affiliate Tracking Software), which was used for marketing pornography across different websites. From 2006 to 2010, he acquired several adult websites, including Privat Amateure, MyDirtyHobby, Webcams, and Xtube. In March 2010, Thylmann purchased the assets of two additional pornographic sites, Mansef and Interhub, which had been developed by four Canadian entrepreneurs, for over $100 million. Collectively, these properties merged into a new entity called Manwin in 2010.

57.    From 2010 to 2013, Manwin acquired numerous adult entertainment properties, including YouPorn, Twistys, and RedTube, among others. In 2011, Manwin raised $362 million in financing from various investors, including Fortress Investment Group and JPMorgan Chase. Manwin entered partnerships with established adult entertainment brands, including becoming an operating partner of Playboy in November 2011.

58.    In October 2013, Thylmann sold his stake in Manwin to the company's senior management after facing tax evasion charges in Germany. The company was subsequently rebranded as MindGeek. MindGeek continued to expand its operations through acquisitions and partnerships in the adult entertainment industry throughout the 2010s. In March 2023, MindGeek was acquired by Ethical Capital Partners, a private equity firm based in Ottawa.

59.    In August 2023, MindGeek announced that it was purchased by Ethical Capital Partners ("ECP") and rebranded as Aylo, stating that the change was in response to "the need for

a fresh start and a renewed commitment to innovation, diverse and inclusive adult content, and trust and safety."

60.     Presently, Aylo and its subsidiaries operate under a centralized management structure, where a small and insular group of central decision makers exercise complete control over Aylo and its subsidiaries' operations, including oversight of their systems, content moderation tools, verified uploader programs, and centralized safety protocols.

61.     Based on information and belief, Aylo is operated under a vertically integrated scheme where all financial control comes from the top. ECP owns Aylo entirely, making it the ultimate financial controller of Aylo and all its subsidiaries. The entities under the Aylo umbrella commingle funds and assets, using common funds to hire and host employees, launch products, and operate their businesses.

62.     ECP's leadership, such as VP of Compliance Solomon Friedman, exercises substantial influence over operational decisions across Aylo and its subsidiaries. Other Aylo executives oversee multiple brands under its corporate umbrella. Aylo uses centralized hiring practices to draw in project managers, engineers, designers, content moderators, software developers, QA analysts, security analysts, and administrators. These employees nominally work for Aylo. In practice, however, these employees are assigned to particular Aylo subsidiary projects.

## D.    Defendants' Products Dominate the Highly Lucrative Online Pornography Market

63.     Defendants' flagship asset is Pornhub.com, or simply "Pornhub." Pornhub was launched in 2007 and bought by Aylo in 2010. In its current iteration, it is a video-sharing platform and free, ad-supported, adult content hosting and streaming website, offering users content uploaded by other users, models, and third-party adult entertainment companies.

64.    Pornhub is the most popular online pornography platforms in America and one of the most viewed websites on the internet. Of the 1.5 billion websites on the internet, Pornhub is routinely one of the 10 most trafficked, with 42 billion visits per year, 115 million visits per day, and 4.5 million visits per hour. The site boasts 6.8 million videos uploaded per year, content that would require a total of 169 years to watch. One study in 2020 concluded that Pornhub was the website with the third greatest impact on society in the 21st century, after Facebook and Google.



Times Square 2014

65.    In addition to Pornhub, Defendants own and operate 3 more of the country's top 7 most visited free pornography streaming platforms: RedTube, YouPorn, and Tube8. RedTube, like Pornhub, offers a range of professional and amateur content across multiple categories. YouPorn specializes in features like live sessions and personalized content recommendations. Tube8 promotes itself as using an award winning search function and hosting a content library with millions of videos. These platforms are part of Defendants' extensive network of free platforms, which collectively dominate a significant portion of the American and global online pornography market.

66.    Pornhub and Defendants' other subsidiaries generate approximately half a billion dollars in annual revenue within the U.S. This constitutes nearly 50 percent of the total U.S.

online pornography market. These companies generate their revenue from three primary sources: advertising, subscriptions, and selling user data.

67.    Advertising generates approximately 50 percent of Pornhub's profit. It serves billions of daily ad impressions and generates substantial income through banner ads and video advertisements displayed on its free content pages. These ads are tailored to users based on their browsing behavior, ensuring high engagement and conversion rates. Pornhub also incorporates affiliate links for other Defendant properties that promote external products or services, such as subscription-based platforms or adult product retailers. Pornhub earns commissions on sales generated through affiliate traffic.

68.    In addition to free platforms like Pornhub, Defendants also operate several "premium" websites, including PornhubPremium.com, YouPornPremium.com, and RedTubePremium.com. These sites offer paying subscribers additional content without advertisements behind a paywall. Analysts estimate Aylo subsidiaries collect approximately 40 percent of the premium subscription market.

69.    Defendants generate revenue by harvesting and selling data about users who visit their platforms. Websites like Pornhub collect extensive user data, including IP addresses, viewing habits, search terms, and even specific moments users pause or rewind videos. This data is used to create detailed user profiles and customized content, with Defendants employing "data-driven authorship" to produce tailored pornographic material based on user preferences. Defendants' advertising service subsidiaries, TrafficJunky and Adult Force, serve billions of targeted ads daily using the information they collect from both Aylo platforms and elsewhere on the internet.

70.    In addition to distributing online pornography through platforms like Pornhub, Defendants also produce online pornography. Defendants' subsidiaries own and operate numerous pornographic film studios, including Brazzers, Digital Playground, Men.com, and Reality Kings. These subsidiaries produce their own pornographic content through in-house production studios and contractors. These subsidiaries employ professional teams, including directors, producers, writers, and performers, to create adult films tailored to specific niches and audiences. The production process involves scripting scenes, casting performers, and securing locations. These entities utilize state-of-the-art filming equipment and editing techniques to create polished and professional aesthetic that aligns with their brand identities. Brazzers, which was founded by the same men who launched Pornhub, works with U.S.-based production companies to create its own original, branded pornographic content, which it hosts behind a paywall. The content that Brazzers and the other Aylo-owned studios produce is also hosted on Defendants' non-producer platforms, like Pornhub. By operating both the platforms and the producers, Defendants funnel traffic to their own content, sidelining competitors. Despite branding differences, these platforms prioritize Aylo-owned studios in recommendations and monetization.

71.    Defendants offer partnerships to third-party companies through a "Content Partner Program." These partners typically operate their own subscription-based or fee-based websites. Content Partners receive dedicated channels on Defendants' free platforms, where they can upload content and place advertisements linking to their own websites. Defendants promote Content Partners to users through personalized channels and links. When users purchase subscriptions to Content Partners' websites through these links, Defendants earn a commission or revenue share. The View Share Program for Pornhub Premium allows Content Partners to

26

upload paywalled videos accessible only to subscribers. Partners are compensated based on view counts of their content. Defendants actively promote Content Partners by providing links to their pay-sites to users.

72.     Defendants dominate the online pornography market by controlling the entire lifecycle of adult content—from production to distribution—but strategically fragments its public image. This vertical integration allows Defendants to both produce and distribute pornographic content through their various platforms, but keep an illusion of separation.

**E.     Defendants' Platforms Are, by Their Own Admission, "Products" and Defendants Are Subject to Liability for Their Defective and Harmful Design Features**

73.     Defendants offer internet users access to pornographic content—some of which they produce themselves—but they provide their own proprietary product as well: strategically designed platforms. Defendants design and control the platforms with which their users interface and access pornographic material and create algorithms and other tools that transform the presentation of the material to users and keep them engaged.

74.     Defendants' platforms design and operate their platforms with a focus on maximizing user engagement and, in turn, ad revenue. To this end, they layout their platforms strategically to encourage frequent and sustained engagement.

75.     This includes basic design features, such as sharply contrasting color schemes, generally featuring a black background with bright, contrasting colors like orange, and a grid layout of video thumbnails to capture attention. This design, while seemingly cluttered, is strategically crafted to keep users engaged and clicking through multiple pages or videos, maximizing ad exposure and potential revenue. These layouts are also designed to be adaptable to various devices (desktop, mobile, and tablet) and incorporate features for optimized video playback for different screen sizes and resolutions. Full-width layouts or in-strip designs can

enhance visual appeal. The platforms are also designed to optimize speed for quick video load times and minimal lag or buffering issues and to prevent user disengagement.

76.    The platforms add interactive elements, such as floating play buttons, hover effects on thumbnails, and video previews to engage users. Search bars, site tree menus, and filters are added to help users find videos quickly. The platforms apply metadata for videos (titles, descriptions, keywords) to improve search engine visibility and ensure accessibility for users searching for specific content.

77.    Categorization and search functionality are another key design feature of Defendants' platforms. Defendants organize content into categories, tags, and genres, allowing users to easily find content aligned with their interests. Defendants have developed algorithms to recognize patterns within the immense volumes of data on their platforms, categorize content accordingly, and present it to keep users engaged. Defendants embed metadata and other elements to their content, modifying it from its original form. This process ensures that content appears only for users who wish to see it and in the most ideal location to meet user wishes, all to keep users engaged on the platform.

78.    These design features require Defendants to undertake substantial programming efforts. First, Defendants define a categorization or tagging taxonomy, or a structured framework that they use to classify content into logical groups, i.e., by special interest, type of media, or country of origin. Defendants then apply a classification method, which involves using AI and machine learning-based classification tools to target users with content specific to their preferences. User profiles, which Defendants generate based on location data and IP addresses, allow Defendants to record user preferences and direct content tailored to user desires.

79.     Defendants "clean" their categories by removing irrelevant or duplicate content to ensure accurate categorization. They also regularly update categories to reflect new trends or changes in content themes, drive business to other subsidiary sites, content partners, or advertisers who they wish to satisfy. Again, this process is executed using AI-driven tools for efficiency with minimal oversight for nuanced or context-specific decisions.

80.     Like physical products that are refined based on consumer preferences, Defendants' platforms use extensive data analytics to inform content presentation and creation. They track user behavior, including time spent on the website, bounce rates, video completion rates, time of viewing habits, search terms, and specific moments users pause or rewind, to produce tailored pornographic material. Defendants use this data to identify other content likely to appeal to specific users and target those users with such preferred content. These features act to draw users back to the platforms again and again.

81.     These design features also include pre-access displays, such as an age verification popup, or "age gate," which appears before any content displays when a user first accesses the platforms. Defendants' platforms typically require users to confirm they meet the minimum age requirement (e.g., 18) through a disclaimer and agreement before proceeding. Defendants' platforms use the most minimalist age verification tool imaginable, requiring only one click by a user confirming their age, then remembering the device from which they clicked and never asking for age verification again. This design is intended to guarantee engagement and keep the age gate open.

82.     Not only do Defendants' platforms resemble products, Defendants acknowledge that they are products. While Aylo predominantly derives its revenues from intangible offerings, i.e. advertisements and subscriptions, it commonly refers to its platforms as "products." The

Aylo website is replete with references to the "platforms and products" that its companies "create" and "develop." Aylo's mission statement posted on Aylo.com states that one of its five "core principles" is "how we create our products." This terminology is repeated throughout the site. Its About Us page states, "… we develop innovative platforms and products …" and describes a "safer user journey promoting diversity and inclusion across all our products and platform ecosystems …." Its Careers page claims its company's diversity results in "stronger products." Pornhub uses similar language. For example, its Privacy Notice page refers to the site as a "safe, secure product."

## Our Mission Statement

Our core principles are how we run our company, how we work with our partners, how we create our products, how we engage with our consumers and how we support and empower our people.

### Content

We enable our people and partners to create content that will offer a positive and safe user journey promoting diversity and inclusion across all our products and platform ecosystems.

**About Aylo**

**We are diverse, dynamic and collaborative. Together, we develop innovative platforms and products that are at the forefront of technology.**

### A Cultural Mosaic

From east to west, we are a multicultural team of individuals working toward one common goal to be the best we can be. We value difference and strive to foster a professional community where diversity is celebrated on all fronts. In doing so, we benefit from many perspectives, resulting in stronger products and a superior experience for both our users and our employees.

83.     By crafting their platforms to be as addictive as possible, producing their own material to seize users' interest, and supplementing the material they display with their own design features, Defendants have become more than passive hosts. They have put themselves in the best position to control the risk of harm caused by their platforms. They are, therefore, responsible in the same way as designers of physically defective products for the harm their design choices cause.

### F.     Defendants Know that Minors Are Using Their Pornography Platforms and Design and Market the Platforms to Appeal to Minors

84.     Defendants collect granular data on their users and freely publish extremely detailed reports of user demographics and behaviors. Pornhub, for example, collects and publishes user data on an annual basis describing in detail user browsing patterns and content interactions.

85.     The data Defendants collect includes the users' historical page views, search queries, video interactions (i.e., watches, likes, and shares), IP addresses, browser types, operating systems, geographic location, and watched video history. They also collect highly sensitive information, like users' sexual preferences based on watched videos (e.g., categories like "LGBTQ+" or niche fetishes), without consent. For registered users, Defendants collect their email addresses and payment information. Using this information, Defendants create detailed user profiles that feed recommender systems to create targeted ads and content suggestions.

86.     Defendants capture and retain the age of individual users. They determine users' ages to a high degree of accuracy by analyzing click patterns and web navigation; the time users spend on different types of content; users' social media activity and preferences; the topics and wording used in search queries; the types of devices or technologies used to access the platforms; the type of content the users consumes, such as news, entertainment, or educational material;

their online purchasing behavior and product interests; their language and communication style in comments, forums, and chat features; and the time of day of their online activity, which have distinct patterns in terms of when they are most active online.

87.    Defendants also know of users' ages based on information from third parties. Mobile device makers share data with websites, allowing access to the network that includes user age based on date-of-birth matches or verified account settings. They also know users' ages by Google integration. If connected, a user's social media activity and profile information can be used to determine their age.

88.    Defendants publicly admit they collect user age data by publishing granular information about user demographics. For example, Pornhub's annual "Year in Review" report reveals the average user age, which was 38 in 2024 and 37 in 2023. It identifies the largest group of users by age as being 18 to 24-year-olds, or 27 percent of traffic, followed by 25 to 34-year-olds, or 24 percent of traffic. The report also notes different demographics' distinct content preferences, confirming Defendants know the age of users who are consuming specific content.

89.    In 2024, an undercover journalist released footage of recorded conversations with Defendants' employees about children accessing Defendants' platforms. In the footage, several employees explicitly acknowledge their awareness of children accessing the platforms.

> Journalist: "There was a study that was like, I think it was like, 11 years old is the average age that kids are now viewing porn. What do you think about that?"
>
> Aylo Technical Product Manager: "I mean, it sounds like my age. I mean it makes sense, you know? Definitely associated with puberty."
>
> Journalist: "Do you think that kids go on, like, Men.com?"
>
> Aylo Technical Product Manager: "Do I think they go on there?"
>
> Journalist: "Yeah."
>
> Aylo Technical Product Manager: "Yeah, yeah, I think they still go on there for sure."

Journalist: "Some LGBTQ kids who just are so confused and lonely and, like, scared, you know?"

Aylo Production Coordinator: "Yeah and it's not right for them to feel that way."

Journalist: "Do you think Men.com is a good resource for that?"

Aylo Production Coordinator: "I'm sure. Yeah. I mean, they'll find their kink in there, I'm sure."

90.     Conservative estimates indicate approximately 5.8 million underage Americans, residing in every state in the U.S.[2], are exposed to Defendants' pornography platforms every year.

91.     Defendants tailor their platforms to engage minors and keep them coming back, just as they do all other demographics that use their platforms. For example, Defendants create category titles and catalog the content posted on their platforms in a manner that highlights categories that appeal to children. The category titled "Cartoon," for example, portrays animated parodies of Disney characters and popular children's programs like Dragon Ball Z. Another category named "Gaming," in reference to videogames, features animations and live-action scenes with characters like Tomb Raider's Lara Croft and Street Fighter's Chun-Li. The "Hentai" category includes a style of Japanese pornographic anime and manga, often featuring characters in school uniforms or appearing as part mythical creatures. The popularity of searches for this content is known to spike at times when minors are most likely to be online and, based on information and belief, Defendants possess data confirming these category titles are especially popular with underage users.

---

[2] As discussed below, platforms like Pornhub that purportedly block access to their websites in certain states, are nevertheless regularly viewed in those states by simple workarounds, which Defendants actively promote.

92.    "Tags" are keywords or labels assigned to videos hosted on websites that describe the videos' content, making them easier to categorize and discover through search. Defendants' platforms use tags to organize content, direct online traffic to their platforms, and recommend content to users based on their interests. Defendants apply tags to the content on their platforms that allow users to search for interests tailored for minors. For example, Pornhub's Year in Review reports repeatedly confirm the popularity of the tags "Super Mario," "Pokémon," "The Legend of Zelda," and "Minecraft." Other content on Pornhub uses the tags "Star Wars," "Harry Potter," and "Spiderman." Not coincidentally, these are also three of the most popular movie franchises among children over the last 20 years.

93.    Defendants' conduct shows they want more underage users to engage with their products. For example, they use social media tools to market their products to underage users. Pornhub, for example, had an Instagram account with over 13 million followers and over 6,000 posts. It was allowed to operate this account until March 2025, despite years of suspensions and warnings for violating Meta's platform policies. When the account was active, Defendants used it to appeal to minors through trending memes, viral challenges, and pop-culture references— content often overlapping with youth internet culture. Examples included posts riffing on popular TikTok dances, video game references, and humor that blurred lines between adult marketing and youth engagement like a meme using a doctored image of "baby yoda" from Disney's The Mandalorian watching pornography. The account's 13 million followers included underage users drawn to such content.

94.    Pornhub has maintained accounts on X (formerly Twitter), YouTube, Discord, and other social media sites willing to give it a platform. Its posts on these sites have focused on humor, model promotions, and brand engagement intended to normalize a pornography company while avoiding explicit material. These posts are frequently designed to appeal to minors. An October 2019 post on X read, "We have more holes to stare at than #Fortnite," calling out the popular videogame. Three of every 10 Fortnite players are under 18. In January 2020, another X post read "If you like Twitch, you'll love Pornhub Live," referring to the live-streaming platform where users, approximately 10.1 million of whom are minors, load and watch videogame play. This post was featured two slots above a post reading, "Be a slut! Do whatever you want!" Another post displayed a drawing depicting what appeared to be very young character in Pornhub branded clothing.

 

95.     While social media companies are generally not directly involved in distributing adult content, the design and algorithms of these platforms is known to herd users, including minors, to exposure to sexually explicit and pornographic content. A 2024 investigation conducted by the Wall Street Journal and researchers from Northeastern University found that social media sites like Instagram recommend sexual videos to teenagers' accounts within minutes of when they first log in. Investigators found that shortly after setting up new accounts, teenagers on Instagram were served "moderately racy" videos. When the investigators watched these videos, the platform recommended more and more extreme content until the feed was inundated with sexual content. Based on information and belief, this is the result of a unified and synchronized collaboration between online pornography entities like Defendants and the social media platforms that have the common goals of user engagement and addiction.

96.     Aided by social media platforms, Defendants seek to normalize pornography in the lives of children by adopting kid-friendly messaging and images in their posts. Marketing pornography to children in this way is unethical, harmful, and illegal. Several social media-centered advocacy groups have called for outright bans prohibiting Defendants from having any presence on social media. But where social media platforms have reacted, they have been slow

and inconsistent. Thus, Defendants' role in this space remains constant and is likely to expand if their mission to normalize pornography is successful.

> **G.    Defendants Refuse to Implement Commonly Used Age Verification Features**

97.    Historically, sellers of pornography that occupied brick and mortar retail facilities checked the IDs of patrons who wanted to buy pornography to verify their ages, just as they would for buyers of alcohol, tobacco, lottery tickets, and firearms. By its nature, the distribution of online pornography to home computers and mobile devices made traditional age verification infeasible. But the technological limitations that once prevented companies from verifying users' ages are gone. It is now possible to create "adult zones" on the internet that distinguish adults from minors. This is not just possible—it happens in the real world.

98.    The technology available to verify the age of online users accessing pornographic content has evolved significantly in recent years, driven by growing concerns about minors' exposure to explicit material. As of 2025, several methods have been employed or considered for age verification.

99.    Government-issued ID checks are one of the most reliable methods for age verification. Users are required to upload a photo of their driver's license, passport, or other government-issued identification. Advanced systems use AI and machine learning algorithms to analyze these documents for signs of tampering or forgery, enhancing the accuracy of verification.

100.    Facial recognition and liveness detection have become increasingly sophisticated. Some age verification systems require users to take a "selfie," or a photo of themselves, which is then compared to the photo on an uploaded ID using facial recognition technology. Liveness detection ensures that the selfie is taken by a live person, preventing spoofing attempts.

101.    Online vendors have used various other methods of age verification as well. Credit card or financial verification is another common method, as only adults possess valid credit cards. Mobile number checks are sometimes used, requiring users to enter their mobile numbers, then verifying their age by accessing customer details from their network operators. Biometric verification, such as facial recognition or voice analysis, is used to determine a user's age by analyzing physical traits to determine if a person is likely above the legal age threshold. Third-party verification providers have emerged as specialists in securely verifying users' ages while minimizing the amount of personal data collected.

102.    E-commerce platforms that sell and deliver alcohol, like DoorDash, require shoppers to upload an ID in order to make a purchase and often utilize third-party databases like LexisNexis to confirm a buyer's age before checkout. DraftKings and other online gambling sites verify users' ages using ID scans and social security number crosschecks. Responsible streaming services like Netflix and HBO verify users' ages through account records and credit card verification. Car rental companies verify renters' ages through multi-layered digital identity checks, combining government ID validation, biometric authentication, and blockchain technology to comply with driving age requirements.

103.    Several Pornhub competitors, including 3 of the top 7 most viewed adult sites in the U.S., utilize legitimate age verification tools on their sites. Before a user can access these sites, they must confirm with ID that they are over 18. These companies make good faith efforts to verify users' ages even though such measures reduce engagement and advertising revenues.



104.    By comparison, Defendants design their platforms with no age verification tools whatsoever. Instead, they use popup windows that ask users whether they are 18—a design feature intended to minimize obstruction to user access—and admit anyone who clicks a button claiming that they are to the platforms.

105.    On Pornhub, for example, underage users access the home page simply by clicking a button highlighted in gold and reading "Enter," instead of a black button set on a black backdrop that is nearly invisible reading "Exit." All of Defendants' other free streaming sites use a similar design, changing only the color of the "Enter" button. Immediately after clicking an "Enter" button, users are exposed to dozens of thumbnails of pornographic content and advertising, often from other Aylo content producers, displaying pornographic videos.



106.    Undercover video footage shows Defendants' employees candidly admitting these features do almost nothing to prevent minors from accessing the content on their platforms.

Journalist: "To get on [Pornhub], what do you have to do?"

Aylo Production Coordinator: "Not much."

Journalist: "How easy is it for an underage person to view the site?"

Aylo Technical Product Manager: "Just go to the site."

Journalist: "All you have to do is, like, what probably check a box or something?"

Aylo Technical Product Manager: "I think so, yeah. It probably just asks you, 'are you 18-years-old? Yes or no?' I don't think they've done too much on that."

107.    Even Pornhub's website acknowledges Defendants' age gates are ineffective, stating:

> "There are multiple ways that a user can prove their age, but any effective method requires them to submit some form of personally identifiable information ('PII'), like a driver's license."

It is inconceivable that Defendants can claim they protect minors from exposure to their product while simultaneously acknowledging that their only design feature meant to do that does not work.

108.    This design feature is a hazardous defect that results in millions of minors being exposed to pornography. Defendants use this design so they can pay lip service to their dedication to protecting minors while making access as easy as possible, ensuring immediate engagement and long term addiction. Short of sending free pornography directly to children's mailboxes, Defendants could not do less to protect them.

109.    Defendants' lax attitude toward child safety runs in the face of claims Defendants make about the importance they place on protecting minors from exposure to their platform. For example, Pornhub claims "We take seriously our commitment to the safety of our users and integrity of our platform … access to our platform is strictly limited to those who affirm that they are at least eighteen."

110.    Mystifyingly, Defendants claim to support age verification in theory, but argue it is not their responsibility. Defendants cannot deny, however, that they have complete control over the design features users encounter (or do not encounter) on their platforms, including their age gate design features. Accordingly, Defendants are responsible for the harm such defectively designed features cause.

### H.    Defendants' War Against Age Verification Legislation

111.    "Requiring proof of age is an ordinary and appropriate means of enforcing an age-based limit on obscenity to minors. Age verification is common when laws draw age-based lines, *e.g.,* obtaining alcohol, a firearm, or a driver's license. Obscenity is no exception." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291 (2025).

112.    A 2022 poll commissioned by the Institute for Family Studies and YouGov found that 86 percent of American parents believe it is too easy for children to access online pornography. Perhaps that is why Politico referred to age verification as "perhaps the most bipartisan policy in the country." Marc Nivicoff, "A Simple Law Is Doing the Impossible. It's Making the Online Porn Industry Retreat." POLITICO MAGAZINE (Aug. 8, 2023).

113.    As a result, the online pornography industry has, in recent years, faced increasing scrutiny and regulatory challenges relating to its failure to protect children from exposure. Issues such as age verification, content moderation, and the fight against non-consensual content have come to the forefront. While it has been illegal to show or provide pornography to minors for decades, regulators recently began specifically requiring pornography websites to verify the age of their users.

114.    In 2022, Louisiana became the first U.S. state to implement age verification laws for online pornography, with several other states, including Utah, following suit in 2023.

Presently, 21 states have passed age verification laws and an additional 16 states have introduced legislation that would require age verification.

115.    Rather than comply with laws requiring age verification, Defendants have chosen to fight against such laws, attempting to retain the gains they have made, illegally, in the market for underage viewers.

116.    Defendants constantly lobby against age verification laws because they know that minors are a valuable demographic and they do not want to lose ad revenue.

117.    Defendants have also challenged age verification laws in court. Defendants or the lobbying organizations they fund have sued the states of Texas, Utah, and Louisiana to block age verification laws. All such efforts have been unsuccessful. This is, in part, because age verification is not a limit on free speech. Defendants and other online pornography companies can distribute pornography on their platforms, even in states with age verification laws. They just have to confirm the user is of an appropriate age first. Thus, Defendants' legal challenges to laws requiring age verification are doomed to fail.

118.    Another way Defendants have fought against age verification laws is by blocking access—at least by appearances—to their platforms in these states that require age verification, citing First Amendment concerns. When users in these states try to access one of Aylo's platforms, they see messages like the following:

> "[Age verification] bills have failed to protect minors, by driving users from those few websites which comply, to the hundreds of thousands of websites with far fewer safety measures in place, which do not comply."
>
> … or:
>
> "As you may know, your elected officials in Utah are requiring us to verify your age before allowing you access to our website. While safety and compliance are at the forefront of our mission, giving your ID card every time you want to visit an adult platform is not the most effective solution for protecting our users, and in fact, will put children and your privacy at risk."

119.    In reality, children in these states are accessing Defendants' pornographic content anyway. The most common workaround in states where Defendants' platforms are "blocked" is use of a virtual private network, or "VPN," to access the internet. VPNs are widely used to bypass geo-blocks like those used by Defendants. To install a VPN, users simply select a provider and download software. Most VPN software features a one-click connect option, making VPN access as easy as opening a web browser. Once connected, the VPN encrypts online traffic and routes it through a remote server, masking the user's real IP address and, thus, their physical location. When a resident of a state where Pornhub has "blocked" to its website uses a VPN, they can access the site just as they could before it was blocked.

120.    In 2018, Pornhub launched its own VPN product called "VPNhub" so that users could access its site without IP address verification, allowing a workaround for age verification. Pornhub claimed VPNhub utilized more than 1,000 servers in 15 different countries that re-routed users to make their location undetectable.

121.    The service included a free, ad-supported version that did not require users enter credit card information and a "premium" paid subscription that removed ads and offered a wider range of servers that users could use to hide their location. Based on information and belief, Defendants used targeted advertising to promote the VPNhub service in states and countries where Defendants ostensibly blocked access, facilitating users' continued engagement with their platforms.

122.    Based on information and belief, VPNhub was run through a "white-label arrangement" where Pornhub advertised and sold the VPN services as its own, but the service provider was actually a separate entity. Pornhub terminated VPNhub in 2022, but began referring

customers to a "partner provider" called IPVanish. As of the date of this filing, Pornhub

continues to refer users to IPVanish as a means to avoid state laws requiring age verification.



123.    There has been a notable surge in interest for VPNs in states, including Utah,

where Google searches for the terms "virtual private network" and "VPN" surged after the

states' age verification laws went into effect. Based on information and belief and on an analysis

of publicly available market research data, Plaintiffs allege that Defendants actively targeted

consumers in states that enacted age verification laws, including consumers in Utah, for sales of

their VPNhub and IPVanish products shortly after these states' age verification laws took effect.

124.    In 2023 and 2025, when Utah's two age verification laws took effect, online

searches for "VPN" more than doubled. Similarly, when Defendants started to block online

access in Florida and South Carolina after those states' age verification laws took effect, searches

and sales of VPNs skyrocketed. In the two months after Virginia's age verification law took

effect, downloads of the popular NordVPN increased fifteen percent and the number of Google

users who searched for VPNs was higher than in any other state in the country.



125.    One-quarter of children fifteen years old or younger report that they know how to

operate a VPN or use other work arounds that allow them access to Defendants' online

pornographic content. Web platforms like Defendants know this and use the fact that underage web users utilize VPNs to provide continued access to their sites, even after they are ostensibly "blocked."

126.    If Defendants simply complied with the law and verified their users' ages, it would not matter where a user was when they viewed a site. Whether accessing the site from a VPN or their home internet network, they would have to prove their age.

**I.    Aylo's Defectively Designed Products Are Directly Responsible for Harm to Minors Throughout the U.S.**

127.    Defendants choose to design their platforms without a simple and effective safety measure. If they used age verification tools like their competitors, it would greatly reduce or eliminate children's exposure and addiction to pornography. It would also greatly reduce or eliminate the harm their products cause children.

128.    But in the words of one subject in the undercover documentary referenced above who was asked about child exploitation, Defendants "don't give a fuck." They seek only to maximize their already enormous revenues with no concern for the psychological, emotional, and sexual health of a generation of children.

129.    Defendants' conduct described herein is unfair, illegal, and greedy. After bombarding children with manipulative marketing designed to entice them into a shadowy world of harmful adult content, Defendants seek to keep these children engaged on their platforms to prove to advertisers that their products are effective.

130.    Plaintiffs bring this action to enjoin this misconduct and reclaim the loss Plaintiffs will endure through years of past and future harm.

## V.    TIMELINESS AND TOLLING OF STATUTE OF LIMITATIONS

131.    Through the exercise of reasonable diligence, Plaintiffs did not and could not have discovered that Defendants' products caused their injuries because, at the time of these injuries, the cause was unknown to Plaintiffs.

132.    Plaintiffs did not suspect and had no reason to suspect Defendants' products caused their injuries until less than the applicable limitations period prior to the filing of this action.

133.    Due to the highly technical nature of the platforms' features, Plaintiffs were unable to independently discover that Defendants' products caused their injuries until less than the applicable limitations period prior to the filing of this action.

134.    Defendants had exclusive knowledge of the material defects designed and implemented into their platforms, and they have at all times through the present maintained their proprietary designs of their platforms' features as strictly confidential.

135.    Defendants' fraudulent concealment or other tortious conduct has tolled the running of any statute of limitations.

136.    Defendants had a duty to disclose dangerous and defective features that cause foreseeable harm to minors.

137.    Defendants knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of Defendants' products and that these products caused their injuries.

138.    Defendants committed tortious or fraudulent acts that continue to this day. As of the date of this Complaint, Defendants still have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their platforms. Despite their knowledge of

the defects and their attendant safety risks, Defendants continue to market their platforms to minors while simultaneously omitting the disclosure of known and foreseeable harms to minors.

139.    Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

140.    For the foregoing reasons, Defendants are estopped from relying on any statutes of limitation or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## VI.    <u>CLASS ALLEGATIONS</u>

141.    Plaintiffs bring this action to seek equitable non-monetary and monetary relief as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and the following Class and Subclasses:

<u>Class</u>: All persons in the United States who were exposed to pornography by Defendants' platforms before reaching the age of 18.

<u>Damages Subclass</u>: All Class members who experienced out of pocket expenses for treatment related to their exposure.

<u>Utah Subclass</u>: All Class members who were residents of the State of Utah at the time of their exposure.

<u>Michigan Subclass</u>: All Class members who were residents of the State of Michigan at the time of their exposure.

<u>California Subclass</u>: All Class members who were residents of the State of California at the time of their exposure.

<u>New York Subclass</u>: All Class members who were residents of the State of New York at the time of their exposure.

142.    Plaintiffs reserve the right to amend the Class definition if discovery, further investigation, or procedural developments demonstrate that it should be expanded or otherwise modified.

143.    The members of the Class are so numerous, counting in the millions, that joinder of all members would be impracticable.

144.    There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members, including:

   a.   Whether Defendants' platforms are products;

   b.   Whether Defendants designed their platforms in a defective and harmful manner;

   c.   Whether Defendants failed to utilize design features on their platforms that would have prevented the harms alleged herein;

   d.   Whether Defendants failed to warn the Class of the harm their platforms were likely to cause;

   e.   Whether Defendants owed the Class a duty of reasonable care;

   f.   Whether Defendants breached the duty of care they owed the Class;

   g.   Whether Defendants concealed known facts of material importance from the Class;

   h.   Whether Defendants' concealment of material facts from the Class was intentional;

   i.   Whether Defendants' conduct violated consumer unfair trade practices and consumer protection law of the various states where they operate;

   j.   Whether Defendants persuaded, induced, or enticed minors to engage in sexually explicit conduct; and

  k. Whether, and if so in what amount, the Class suffered damages from injuries

   sustained by Defendants' conduct;

145. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs have no interests

antagonistic to those of the Class and are not subject to any unique defenses.

146. Plaintiffs will fairly and adequately protect the interests of the Class and have

retained attorneys experienced in class action and complex litigation.

147. A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy for, inter alia, the following reasons:

  a. It is economically impractical for members of the Class to prosecute individual

   actions;

  b. The Class is readily ascertainable and definable and notice of this class action can

   be efficiently provided through direct online communication and publication

   using the best means practicable; and

  c. Prosecution as a class action will eliminate the possibility of repetitious litigation.

148. A class action will enable claims to be handled in an orderly and expeditious

manner, will save time and expense, and will ensure uniformity of decisions.

149. This case can be fairly and efficiently managed as a class action, and resolution of

legal and factual issues across all Plaintiffs does not present significant practical problems.

## VII. CAUSES OF ACTION

**First Cause of Action**
**Product Liability – Design Defect**
**(Common Law & Utah Code §§ 78B-6-701, *et seq*.)**

150. Plaintiffs reallege and incorporate the above allegations by reference as if set forth

fully herein.

151.    Plaintiffs assert this products liability claim against all Defendants under Utah common law, under the Utah Code, and under the common law of all states and other jurisdictions in the United States.

152.    The essential elements of a products liability claim under a design defect theory are substantially similar under the common law of all states and other jurisdictions in the United States, the application of which is satisfied by the factual allegations herein.

153.    Defendants' platforms were designed with elements that made them inherently and unreasonably dangerous, including elements intended to capture user attention, keep users engaged and clicking through multiple pages or videos, enhance visual appeal, prevent user disengagement, ensure that content appears only for users who wish to see it and in the most ideal location to meet user wishes, generally addict users to the platform, and present minimal obstacles to access and no age gates to preclude minors from entering the platforms. These design elements were not necessary for the utility provided to the consumers but were implemented by Defendants solely to increase advertising revenue derived from the number of webpages viewed by users and the length of time users consumed their products.

154.    At the time Defendants' products were provided to Plaintiffs and the Class, they contained defects or were in a defective condition, because they were unreasonably dangerous to underage users, or dangerous to an extent beyond anything that would be contemplated by the ordinary and prudent underage user or consumer of those products considering the product's characteristics, propensities, risks, dangers, and uses together with any possible knowledge, training, or experience possessed by underage users or consumers. Defendants' products were unreasonably dangerous to vulnerable underage users or consumers because the foreseeable risks of harm created by their products' designs could have been reduced or avoided entirely by

Defendants' implementation of a reasonable alternative age verification design and the omission of the alternative design renders the product not reasonably safe.

155.    Plaintiffs and the Class were reasonably foreseeable users of the product. Defendants' products were designed to be addictive and easily accessible to underage users or consumers to whom Defendants actively promoted their products by employing kid-friendly messaging and using marketing strategies that tied their products to popular children's media titles such as "Pokémon," "Minecraft," and "Harry Potter."

156.    Plaintiffs and the Class were harmed as a result of the defect, and there was a direct link between the defect and the harm sustained. Defendants' failure to implement simple design elements to prevent underage users from accessing their products allowed Plaintiffs to access and become addicted to these products, which in turn caused their injuries.

157.    Plaintiffs and the Class seek reasonable damages against Defendants as manufacturers of the defective products.

158.    Plaintiffs, exercising reasonable diligence, only discovered their harm and its cause within the last two years. Plaintiffs did not and could not have discovered Defendants' products caused their injuries until less than the applicable limitations period prior to the filing of this action. Plaintiffs could not have independently discovered Defendants' products caused their injuries due to the highly technical nature of Defendants' products. Defendants had exclusive knowledge of the material defects designed into their products that caused Plaintiffs' injuries and actively concealed these defects from Plaintiffs such that Plaintiffs were not aware of the risks associated with use of Defendants' products.

159.    Defects present in the design of Defendants' products caused Plaintiffs' injuries. Therefore, any provision contained in the terms of service of any of Defendants' products or in

any purported agreement between Defendants and Plaintiffs or the Class is void and

unenforceable insofar as it requires Plaintiffs or the Class to indemnify, hold harmless, or defend

Defendants as manufacturers of their defective products.

**Second Cause of Action**
**Product Liability – Failure to Warn**
**(Utah Code § 78B-6-701, *et seq*. & Common Law)**

160.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth

fully herein.

161.    Plaintiffs assert this products liability claim against all Defendants under the Utah

Code and under the common law of all states and other jurisdictions in the United States.

162.    The essential elements of a products liability claim under a failure to warn theory

are substantially similar under the common law of all states and other jurisdictions in the United

States, the application of which is satisfied by the factual allegations herein.

163.    Defendants' products were designed in a manner that made them inherently

dangerous because they failed to warn, or had inadequate warnings or instructions about the risk

of harms to youth created by their products' designs, including distorted views of sexuality;

increased risk of sexual addiction; difficulties in forming healthy relationships later in life;

disassociation; adolescent depression; symptoms such as headache, irritability, trouble sleeping,

poor social functioning, impulsiveness, anxiety, and dysfunctional stress responses; and

impairments to judgment, memory, and emotional regulation.

164.    At the time Defendants' products were provided to Plaintiffs and the Class, they

contained defects or were in a defective condition, which made them unreasonably dangerous to

underage users, or dangerous to an extent beyond anything that would be contemplated by the

ordinary and prudent underage user or consumer of the products, considering the products'

characteristics, propensities, risks, dangers, and uses together with any possible knowledge, training, or experience possessed by users or consumers.

165.    Defendants knew or reasonably should have known their products posed the risk of these harms. Defendants were aware that their website designs did not sufficiently safeguard underage users or consumers from accessing their products but did not take steps to meaningfully improve their age verification protocols. Defendants were also aware that their products contained copious amounts of unmoderated, user-uploaded content that was inappropriate for underage users or consumers to view.

166.    Defendants' products contained defects or were in a defective condition because the foreseeable risks of harm created by their products' designs could have been reduced or avoided entirely by Defendants' provision of reasonable instructions or warnings and the omission of such instructions or warnings renders the products not reasonably safe for underage users or consumers.

167.    Had Defendants warned, the injuries would not have occurred. Defendants possessed extensive knowledge about the risks associated with their products. Despite possessing this knowledge, Defendants failed to warn, or inadequately warned or instructed, users or consumers about the risks associated with use of their products. Plaintiffs and the Class therefore could not have known about the insidious and dangerous nature of Defendants' products and thus could not have made informed decisions about using these products.

168.    Plaintiffs and the Class were reasonably foreseeable users of Defendants' products. Defendants' products were designed to be addictive and easily accessible to underage users or consumers to whom Defendants actively promoted their products by employing kid-

friendly messaging and using marketing strategies that tied their products to popular children's media titles such as "Pokémon," "Minecraft," and "Harry Potter."

169.    Plaintiffs and the Class were harmed as a result of Defendants' failure to warn, or inadequate warnings or instructions, and there was a direct link between Defendants' failure and the harm sustained. Defendants' failure to warn, or inadequate warnings or instructions, allowed Plaintiffs to access and become addicted to these products, which in turn caused their injuries.

170.    Plaintiffs and the Class seek reasonable damages against Defendants as manufacturers of the defective products.

171.    Plaintiffs, exercising reasonable diligence, only discovered their harm and its cause within the last two years. Plaintiffs did not and could not have discovered Defendants' products caused their injuries until less than the applicable limitations period prior to the filing of this action. Plaintiffs could not have independently discovered Defendants' products caused their injuries due to the highly technical nature of Defendants' products. Defendants had exclusive knowledge of the material defects designed into their products that caused Plaintiffs' injuries and actively concealed these defects from Plaintiffs such that Plaintiffs were not aware of the risks associated with use of Defendants' products.

172.    Defects present in the design of Defendants' products caused Plaintiffs' injuries. Therefore, any provision contained in the terms of service of any of Defendants' products or in any purported agreement between Defendants and Plaintiffs or the Class is void and unenforceable insofar as it requires Plaintiffs or the Class to indemnify, hold harmless, or defend Defendants as manufacturers of their defective products.

**Third Cause of Action**
**Negligence – Design Defects**

173.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

174.    Plaintiffs assert this negligence claim against all Defendants under the common law of all states and other jurisdictions in the United States.

175.    The essential elements of a negligence claim under a design defect theory are substantially similar under the common law of all states and other jurisdictions in the United States, the application of which is satisfied by the factual allegations herein.

176.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of users and consumers of their products, such as Plaintiffs and the Class.

177.    As designers of products that users and consumers across the United States, including Utah, are exposed to, Defendants owed a duty to exercise ordinary care in the design of their products, including a duty to eliminate design elements that expose underage users and consumers to risks that Defendants knew to be present, but inconspicuous, in their products.

178.    Defendants had a duty to design their products to ensure that underage users and consumers were unable to gain access. Defendants benefited directly and substantially from allowing underage users and consumers to use their products, knew the content available through their products was harmful to minors, and knew they were benefiting from minors accessing the harmful content.

179.    Defendants had a duty to monitor and evaluate the efficacy of their age verification systems and ensure that underage users and consumers could not access their products.

180.    Defendants had a duty to employ and train personnel to develop and incorporate reasonable and effective design elements that would prohibit access to underage users and consumers.

181.    Defendants had a duty to design, develop, program, distribute, or operate their products to ensure underage users or consumers could not access their products.

182.    Defendants knew that their products' design elements did not suffice to restrict access to underage users. Defendants were also aware that their products' design elements allowed users to circumvent age verification processes by inputting invalid dates of birth or by utilizing VPNs. Despite possessing this knowledge, Defendants failed to take appropriate, reasonable, timely, and necessary remedial actions.

183.    Defendants were negligent, grossly negligent, reckless or careless in that they failed to exercise ordinary care and caution for the safety of underage users or consumers, like Plaintiffs and the Class, by failing to prevent underage users from accessing their products.

184.    Plaintiffs and the Class were harmed as a result of Defendants' breach of duty, and there was a direct link between the breach and the harm sustained. Defendants breached their duty to exercise reasonable care when they failed to implement simple design elements to prevent underage users from accessing their products. As a result, Plaintiffs and the Class used and became addicted to Defendants' products, which caused their injuries.

**Fourth Cause of Action**
**Negligence – Inadequate Warnings**

185.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

186.    Plaintiffs assert this negligence claim against all Defendants under the common law of all states and other jurisdictions in the United States.

187.    The essential elements of a negligence claim under an inadequate warnings theory are substantially similar under the common law of all states and other jurisdictions in the United States, the application of which is satisfied by the factual allegations herein.

188.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of users and consumers of their products, such as Plaintiffs and the Class.

189.    As product makers, marketers, and distributors to users and consumers across the United States, including Utah, Defendants owed a duty to exercise ordinary care in the manufacture, promotion, and dissemination of their products, including a duty to warn underage users and consumers and their parents of risks that Defendants knew to be present, but inconspicuous, in their products.

190.    Defendants knew that access to their products posed serious risks for consumers, especially underage users and consumers who possessed a diminished capacity to make informed decisions regarding their Internet consumption. Defendants knew their products' design elements did not suffice to restrict access to underage users. Defendants were also aware that their products' design elements allowed users to circumvent age verification processes by inputting invalid dates of birth or by utilizing VPNs. Despite possessing this knowledge, Defendants failed to take appropriate, reasonable, timely, and necessary remedial actions. Defendants knew underage users and consumers would be able to access their products, but failed to warn, or adequately warn or instruct, underage users or their parents, of the dangerous risks associated with the use of their products.

191.    Defendants were negligent, grossly negligent, reckless, or careless in that they failed to exercise ordinary care and caution for the safety of underage users or consumers, like

Plaintiffs and the Class, by failing to warn, or providing inadequate warnings or instructions, about the dangers associated with the use of their products.

192.    Plaintiffs and the Class were harmed as a result of Defendants' breach of duty, and there was a direct link between Defendants' breach and the harm sustained. Defendants breached their duty to exercise reasonable care when they failed to warn underage users and consumers and their parents of the risks associated with the use of their products. As a result, Plaintiffs and the Class used and became addicted to Defendants' products, which caused their injuries.

### Fifth Cause of Action
### Negligence

193.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

194.    Plaintiffs assert this negligence claim against all Defendants under the common law of all states and other jurisdictions in the United States.

195.    The essential elements of a negligence claim are substantially similar under the common law of all states and other jurisdictions in the United States, the application of which is satisfied by the factual allegations herein.

196.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of users and consumers of their products, such as Plaintiffs and the Class.

197.    Defendants owed a heightened duty of care to underage users or consumers of their products because such users' brains were not fully developed, therefore they possessed a diminished capacity to make informed decisions regarding their Internet consumption. Underage users and consumers were thus particularly susceptible to the dangerous risks associated with the use of Defendants' products.

198.    As product manufacturers, marketers, and distributors to users and consumers across the United States, including Utah, Defendants owed a duty to exercise ordinary care in the manufacture, promotion, and dissemination of their products, including a duty to warn underage users and consumers and their parents of risks that Defendants knew to be present, but inconspicuous, in their products.

199.    As business owners, Defendants owed users and consumers of their products, from whom they derive billions of dollars in advertising revenue, a duty of ordinary care substantially similar to that owed by physical business owners to their business invitees.

200.    Defendants had a duty to ensure that underage users and consumers were unable to access their products, and that users were adequately warned of the risks associated with use of their products. Defendants benefited directly and substantially from allowing underage users and consumers to use their products, knew the content available on their products was harmful to minors, and knew they were financially benefiting from minors accessing the harmful content.

201.    Defendants had a duty to direct personnel to develop and incorporate reasonable and effective design elements that would prohibit access to underage users and consumers.

202.    Defendants had a duty to design, develop, program, distribute, and/or operate their products to ensure underage users or consumers could not access their products.

203.    Defendants were negligent, grossly negligent, reckless, and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users or consumers, like Plaintiffs and the Class.

204.    Plaintiffs and the Class were harmed as a result of Defendants' breach of duty, and there was a direct link between the breach and the harm sustained. Defendants breached their duty to implement simple design elements that would prevent underage users from accessing

their products, and to warn underage users who did access their products of the substantial risks associated therein. Plaintiffs and the Class accessed and became addicted to Defendants' products, and were injured as a result.

205.    As a proximate result of Defendants' negligence, Plaintiffs and the Class used and became addicted to Defendants' products, which caused their injuries.

206.    Plaintiffs and the Class are entitled to actual damages stemming from the injuries claimed herein. Plaintiffs and the Class are also entitled to punitive damages because Defendants made a concerted effort to target minors in the manufacture, marketing, and distribution of pornographic material through their products when they utilized marketing strategies centered around child-friendly media and messaging. Defendants are liable for penalties of not more than $2,500 per violation plus attorney fees for their acts of distributing or otherwise providing pornographic material to underage users without giving a clear and reasonable warning of the harmful impact the exposure of such material poses to underage users.

**Sixth Cause of Action**
**Knowingly Engaging Minors in a Sexual Act**
**(18 U.S.C. § 2255)**

207.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

208.    Defendants impermissibly caused Plaintiffs to engage in a sexual act despite Plaintiffs' inability to appraise the nature of the conduct or consent to any sexual act. Defendants' failure to safeguard their products from underage users and consumers resulted in Plaintiffs' exposure to sexual content that was inappropriate for minors, which induced Plaintiffs to engage in sexual acts despite their inability to consent due to their minority.

209.    Defendants impermissibly caused Plaintiffs to engage in a sexual act while Plaintiffs were between the ages of 12 and 16 years of age. Defendants' failure to safeguard their

products from underage users and consumers resulted in Plaintiffs' exposure to sexual content

that was inappropriate for minors, which induced Plaintiffs to engage in sexual acts while they

were between the ages of 12 and 16.

210.    Defendants impermissibly used interstate commerce to persuade, induce, or entice

Plaintiffs, before they had reached the age of 18, to engage in sexual activity. Defendants' failure

to safeguard their products from underage users and consumers resulted in Plaintiffs' exposure to

sexual content that was inappropriate for minors, which induced Plaintiffs to engage in sexual

acts.

**Seventh Cause of Action**
**Violation of Unfair Competition and Consumer Protection Statutes**

211.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth

fully herein.

212.    At all relevant times, Defendants were producers, distributors, sellers, suppliers,

designers, marketers, and advertisers of the goods and services described herein. Defendants

benefitted financially from the production, distribution, sale, supply, design, marketing, and

advertising of their products and sold them throughout the United States.

213.    Defendants' conduct was fraudulent, unfair, deceptive, or abusive and violated

consumer protection laws. Certain Plaintiffs will, at a future time, assert a cause or causes of

action against Defendants for consumer fraud or unfair, deceptive, or abusive trade practices

under applicable state law. Defendants are on notice that such claims may be asserted by those

Plaintiffs.

214.    Defendants' fraudulent, unfair, deceptive, or abusive practices that violate state

consumer protection laws include but are not limited to the consumer protection statutes

described below.

**Utah Consumer Sales Practices Act, Utah Code § 13-11-1,** *et seq*. **("UCSPA")**

215.    Plaintiffs and the Utah Subclass members are "consumers" under the Utah Consumer Sales Practices Act, Utah Code § 13-11-3(5).

216.    Defendants are "suppliers" of the platforms and related goods and services that are the subject of this complaint within the meaning of Utah Code § 13-11-3(6).

217.    Defendants engaged in various "consumer transactions" within the meaning of Utah Code § 13-11-3(2), including but not limited to the direct sale of products such as VPNs and other services for personal purposes, the sale of advertising space on their platforms to advertisers on an ongoing basis, and the sale of data collected from user engagement on their platforms to other third parties.

218.    Defendants committed deceptive acts or practices by knowingly or intentionally communicating that they verified the ages of their users and undertook measures to prevent minors from using their products. Defendants failed to disclose the serious harms related to use of their platforms, particularly to minors. Defendants failed to provide adequate notice to minors and to their parents that the platforms they made available to minors were certain to cause lasting and impactful emotional harm. These were indications that Defendants' platforms had characteristics they did not have and were of a particular standard, grade, style, or model, when they were not.

219.    Plaintiffs and the Utah Subclass and Damages Subclass members were injured by Defendants' deceptive and unconscionable acts or practices. Defendants' platforms caused lasting emotional trauma and addiction that required medical intervention and treatment.

220.    As a result of Defendants' violation of UCSPA, Plaintiffs, on behalf of themselves and the Utah Subclass, seek damages, equitable relief, declaratory relief, reasonable

attorneys' fees, and such other relief as the Court may deem necessary or appropriate to remedy these violations.

**Michigan Consumer Protection Act, MCL 445.901, *et seq*. ("MCPA")**

221.    Defendants are and at all relevant times were, subject to the provisions of the MCPA as entities engaged in trade and commerce within the State of Michigan.

222.    The acts and omissions described herein were undertaken in the course of Defendants' business of marketing, offering for sale, and selling goods and services.

223.    Plaintiffs and the Michigan Subclass are "consumers" as defined by the MCPA.

224.    Defendants engaged in fraudulent, unfair, deceptive, or abusive practices included uniformly communicating that they verified the ages of their users and undertook measures to prevent minors from using their products. Defendants failed to disclose the serious harms related to use of their platforms, particularly to minors. Defendants made these representations to the public, the government, and consumers. Defendants failed to provide adequate notice to minors and to their parents that the platforms they made available to minors were certain to cause lasting and impactful emotional harm. Defendants withheld and continue to withhold information regarding the nature and quality of the harm their platforms cayuse. Had Defendants not engaged in the fraudulent, unfair, deceptive, and abusive conduct described herein, Plaintiffs would not have used Defendants' products resulting in the monetary and physical injuries as alleged herein.

225.    By the acts described above, Defendants violated the MCPA by engaging in unfair, unconscionable, and deceptive trade practices, as identified in MCL 445.903(1), including but not limited to:

      a.    Representing that goods or services had sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they did not have;

b.   Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or mode, when they were of another;

c.   Failing to reveal a material fact, the omission of which tended to mislead or deceive consumers, and which fact could not reasonably have been known by the consumers; and

d.   Failing to reveal facts that were material to the transaction in light of representations of fact made in a positive manner.

226.   Defendants' acts and practices constitute a continuing and ongoing unfair business activity defined by the MCPA. Defendants' conduct is contrary to the public welfare as it transgresses civil statutes designed to protect individual consumers, violates established public policy, and has been pursued to attain an unjustified monetary advantage for Defendants. As such, Defendants' business practices and acts have been immoral, unethical, oppressive and unscrupulous and have caused injury to customers far greater than any alleged countervailing benefit.

227.   Defendants generated revenue by collecting advertising revenue from Plaintiffs and the Michigan Subclass's engagement with their platforms. In reliance on Defendants' misrepresentations about their products and services, Plaintiffs and the Michigan Subclass engaged with Defendants' platforms in a manner that they would not have.

228.   Defendants' acts and omissions violated statutory and common law duties it owed to Plaintiffs and the Michigan Subclass, including but not limited to duties to safeguard Plaintiffs and Michigan Subclass members from exposure to pornography as minors as required by 18 U.S.C. § 1470.

229.    As a direct and proximate consequence of the actions as identified above, Plaintiffs and the Michigan Subclass suffered and continue to suffer harms and losses including but not limited to economic loss, the need for future expenses and time dedicated to recovering from their harm, and emotional injuries associated with exposure to pornography as minors.

230.    By engaging in the above-described unfair, unconscionable, and deceptive trade practices, Defendants committed and continue to commit one or more acts of unlawful and unfair conduct within the meaning of the MCPA. These acts and practices constitute a continuing and ongoing unlawful business activity defined by the MCPA, and justify the issuance of an injunction, restitution, and other equitable relief. Additionally, Plaintiffs and the Michigan Subclass members seek all actual and compensatory damages according to proof, reasonable attorneys' fees and costs, and to such other and further relief as this Court may deem just and proper.

**California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL")**

231.    By engaging in the above-described acts and practices, Defendants committed and continue to commit one or more acts of unlawful and unfair conduct within the meaning of the UCL. These acts and practices constitute a continuing and ongoing unlawful business activity, as defined by the UCL, and justify the issuance of an injunction and any other equitable relief pursuant to the UCL.

232.    Defendants' acts and practices constitute a continuing and ongoing unlawful business activity defined by the UCL. Defendants displayed to minors or permitted minors to engage with pornography on their platforms in violation of, *inter alia*, the following laws:

     a.    18 U.S.C. § 1470, Transfer of Obscene Material to Minors;

     b.    18 U.S.C. § 2255, Knowingly Engaging Minors in a Sexual Act;

    c.   California Penal Code § 313.1(a); and

    d.   California Constitution, article I, section 1.

233.    Defendants' acts and practices constitute a continuing and ongoing unfair business activity defined by the UCL. Defendants' conduct is contrary to the public welfare as it transgresses statutes of the State of California designed to protect individuals, violates established public policy, and has been pursued to attain an unjustified monetary advantage for Defendants by creating personal disadvantage and hardship to Plaintiffs and the California Subclass. As such, Defendants' business practices and acts have been immoral, unethical, oppressive, and unscrupulous and have caused injury to customers far greater than any alleged countervailing benefit.

234.    As a direct and proximate consequence of the actions as identified above, Plaintiffs and the California Subclass members suffered and continue to suffer harms and losses including but not limited to economic loss and emotional distress, anxiety, worry, and shock caused by exposure to pornography on Defendants' platforms.

235.    The injuries of Plaintiffs and the Class cannot be wholly remedied by monetary relief and such remedies at law are inadequate. Therefore, Plaintiffs seek an order of this Court awarding injunctive relief and any other relief allowed under the UCL, including interest and attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5, and to such other and further relief as this Court may deem just and proper.

**New York General Business Law §§ 349, *et seq*. ("GBL")**

236.    Plaintiffs and the New York Subclass members are "persons" within the meaning of N.Y. Gen. Bus. § 349(g).

237.    Defendants are "persons, firms, corporations, or associations" within the meaning of N.Y. Gen. Bus. § 349(b).

238.    Defendants engaged in deceptive acts and practices in the conduct of business, trade, and commerce by uniformly communicating that they verified the ages of their users and undertook measures to prevent minors from using their products. Defendants failed to disclose the serious harms related to use of their platforms, particularly to minors. Defendants failed to provide adequate notice to minors and to their parents that the platforms they made available to minors were certain to cause lasting and impactful emotional harm. Defendants thereby misleadingly failed to disclose fully and truthfully all material facts regarding their platforms.

239.    A reasonable consumer would be misled by these deceptive acts and practices. Plaintiffs and the New York Subclass members were unaware that viewing Defendants' platforms would cause lasting emotional harm, addiction, and other injuries.

240.    These deceptive acts and practices were consumer-oriented because they were directed to the consuming public and marketplace and had a broad impact on consumers at large. Defendants made their platforms available to the general public, including through websites (public, online services, not unique to the parties), and through marketing not limited to a single transaction, but instead aimed at a robust consumer and investor base and the marketplace in general.

241.    These alleged deceptive acts and practices occurred (at least in part) in the state of New York, where Defendants conduct business.

242.    Plaintiffs and the New York Subclass members were injured as a direct and proximate result of Defendants' deceptive acts and practices because, among other reasons, they lost money in connection with their recovery from exposure to Defendants' platforms.

243.    Absent Defendants' deceptive acts and practices, Plaintiffs and the New York Subclass members would not have engaged with Defendants' platforms. Plaintiffs and the New York Subclass members are entitled to injunctive relief and to actual damages or fifty (50) dollars per violation (at their election) because of Defendants' deceptive acts and practices. Plaintiffs and Class members are also entitled to treble damages because these actions were willful and knowing. Plaintiffs and Class members are entitled to reasonable costs and attorney's fees.

244.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

### Eighth Cause of Action
### Fraudulent Concealment

245.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

246.    Plaintiffs assert this fraudulent concealment claim against all Defendants under the common law of all states and other jurisdictions in the United States.

247.    The essential elements of a fraudulent concealment claim are substantially similar under the common law of all states and other jurisdictions in the United States, the application of which is satisfied by the factual allegations herein.

248.    Defendants intentionally concealed material facts by failing to disclose the dangerous risks associated with underage users or consumers using their products. Defendants

were aware of the substantial risks posed by exposure to their products, particularly for underage users and consumers whose diminished brain capacity to make healthy and informed decisions made them more vulnerable.

249.    At all times relevant hereto, Defendants had both constructive and actual knowledge of the dangerous risks their products posed, the ease in which underage users and consumers could access their products, and the likelihood of injuries resulting therefrom. Defendants concealed the true nature of their products from consumers and marketed their products as safe and welcome to underage users by employing marketing strategies that used child-friendly media and messaging.

250.    Plaintiffs and the Class relied on Defendants' omission of the risks involved with their products. Plaintiffs were unaware of the risks associated with the use of Defendants' products and could not have independently discovered the nature or extent of such risks. Defendants' failure to disclose the nature of their products and warn of the risks therein resulted in Plaintiffs' use of their products, which in turn caused Plaintiffs' injuries. The facts that Defendants concealed, suppressed, or omitted to disclose were material to the decisions to use Defendants' products and Plaintiffs and the Class would not have used said products had these facts been disclosed.

251.    As a direct and proximate result of Defendants' fraudulent concealment of material facts and defects within their products, Plaintiffs and the Class suffered the injuries and damages claimed herein.

**Ninth Cause of Action**
**Negligent Misrepresentation**

252.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

253.    Plaintiffs assert this negligent misrepresentation claim against all Defendants under the common law of all states and other jurisdictions in the United States.

254.    The essential elements of a negligent misrepresentation claim are substantially similar under the common law of all states and other jurisdictions in the United States, the application of which is satisfied by the factual allegations herein.

255.    At all times relevant hereto, Defendants had both constructive and actual knowledge of the dangerous risks their products posed, the ease in which underage users and consumers could access their products, and the likelihood of injuries resulting therefrom. Defendants concealed the true nature of their products from consumers and marketed their products as safe and welcome to underage users by employing marketing strategies that used child-friendly media and messaging. Defendants did not make any representations regarding the inherently dangerous nature of their products at any point. Despite possessing this knowledge, Defendants continued to transact with Plaintiffs and the Class by allowing them to use Defendants' products, from which Defendants derived hundreds of millions of dollars in advertising revenue.

256.    Defendants failed to exercise reasonable care or competence in communicating the information to Plaintiffs and the Class. Defendants could have easily disclosed the pertinent risks associated with the use of their products. Defendants' conduct towards Plaintiffs and the Class fell below the reasonable standard of care required, particularly for underage users whose brains are not fully developed and are therefore less capable of making healthy decisions and exercising restraint.

257.    Plaintiffs and the Class justifiably relied on the information proffered by Defendants regarding their products. Plaintiffs were unaware of the risks associated with the use

of Defendants' products and could not have independently discovered the nature or extent of

such risks. Defendants' failure to disclose the nature of their products and warn of the risks

therein resulted in Plaintiffs' use of their products, which in turn caused Plaintiffs' injuries. The

facts that Defendants misrepresented through concealment, suppression, or omission were

material to the decisions to use Defendants' products and Plaintiffs and the Class would not have

used said products had these facts been disclosed.

258.    As a direct and proximate result of Defendants' misrepresentations about the

safety of their products, Plaintiffs and the Class suffered the injuries and damages claimed

herein.

**Tenth Cause of Action**
**Distribution of Material Harmful to Minors Without Age Verification**
**(Utah Code § 78B-3-1001, *et seq*.)**

259.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth

fully herein.

260.    Defendants are commercial entities such as corporations, limited liability

companies, partnerships, limited partnerships, sole proprietorships, or other legally recognized

entities. No Defendant is a bona fide news-gathering organization or public interest broadcast.

261.    Defendants, through their products, knowingly and intentionally published,

communicated, or made information available to another person or entity on a publicly available

Internet website, or distributed, issued, sold, gave, provided, delivered, transferred, transmuted,

circulated, or disseminated by any means material harmful to minors on the Internet including

through a VPN.

262.    Defendants' products contain countless instances of adult content in various

mediums such as photos, videos, and live streams. Much of this content contains explicit

depictions of sexual intercourse and pornographic representations of the human body. The

material Defendants published or distributed was harmful to minors because the average person,

applying contemporary community standards, would find it was designed to appeal or pander to

the prurient interest. The average person would also find that the material at issue consisted of

offensive depictions of sexual intercourse that lacked serious literary, artistic, political, or

scientific value and were therefore inappropriate for minors.

263.    Defendants' websites contained a substantial portion (more than 33-1/3%) of

adult content, as described above. The principal offering of Defendants' products is explicit

pornographic material in various mediums, as stated herein. Defendants' products offer very

little, if any, material that is appropriate for minors to view and engage with.

264.    Defendants failed to perform reasonable age verification methods to verify the

age of any individual attempting to access the material harmful to minors available through

Defendants' products. Defendants' products did not utilize a digitized information card (a data

file that contains all of the data elements visible on the front and back of a license or

identification card that may be presented to prove an individual's identity and age); an

independent, third-party age verification service to compare the personal information entered by

a user to the material that is available from a commercially available database regularly used by

government agencies and businesses for the purpose of age and identity verification; or any

commercially reasonable method that relied on public or private transaction data to verify the age

of the person attempting to access their products.

265.    Instead, as designed, Defendants' products used mere pop-up windows that asked

users whether they were 18 years old and admitted to the platforms any user who clicked a

button affirming that they were 18 or over. This method failed to meaningfully verify the ages of

users attempting to access Defendants' products because users were asked to simply confirm that

they were 18 or over by clicking a button and were not required to provide any information that Defendants could use to diligently verify their ages. The system utilized by Defendants falls far below the standard required by Utah Code §§ 78B-3-1001 and 78B-3-1002.

266.    At all times relevant hereto, Defendants had both constructive and actual knowledge that the age verification methods that their products employed were ineffective in precluding underage users from accessing material harmful to minors. As discussed herein, Defendants' employees have candidly admitted that Defendants' products have a minimal barrier to access, even for underage users that are legally prohibited from engaging such services.

267.    Defendants are liable to Plaintiffs for damages, including court costs and reasonable attorneys' fees as ordered by the Court, resulting from Plaintiffs' access to material harmful to minors through Defendants' products while Plaintiffs were below the age of majority.

## VIII.   RELIEF REQUESTED

268.    Plaintiffs, on behalf of themselves and the Class and Subclasses, pray for relief and judgment against Defendants as follows:

    a.   For an order certifying the proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    b.   For an order appointing Plaintiffs and their counsel to represent the Class;

    c.   For an order enjoining Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from allowing underage persons to view their websites;

    d.   For actual and compensatory damages according to proof pursuant to code and all other applicable laws and regulations;

    e.   For restitution to the extent permitted by applicable law;

f.    For punitive damages;

g.    For pre-judgment and post-judgment interest;

h.    For an award of attorneys' fees, costs, and expenses as authorized by applicable

law; and

i.    For such other and further relief as this Court may deem just and proper.

## IX.    <u>JURY DEMAND</u>

Plaintiffs, on behalf of themselves and the Class and Subclasses, demand a trial by jury

on all issues so triable.

Dated this 17th day of December.    **PARKINSON BENSON POTTER**

_/s/ Brennan Moss_
BRENNAN MOSS

**ERICKSON KRAMER OSBORNE LLP**
JULIE ERICKSON
ELIZABETH KRAMER
KEVIN OSBORNE

*COUNSEL FOR PLAINTIFFS*